MONIQUE C. WINKLER (Cal. Bar No. 213031)
MARC D. KATZ (Cal. Bar No. 189534)
 katzma@sec.gov
DAVID ZHOU (NY Bar No. 4926523)
 zhoud@sec.gov
ERIN E. WILK (Cal. Bar No. 310214)

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile:  (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | |
| HEADSPIN, INC., | |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("the Commission" or "the SEC") alleges:

**SUMMARY OF THE ACTION**

1.      From at least 2018 through 2020, HeadSpin, Inc. ("HeadSpin" or "Defendant"), a Silicon Valley technology start-up, through its Chief Executive Officer, Manish Lachwani, engaged in a fraudulent scheme to propel its valuation to over $1 billion by falsely inflating the company's key financial metrics and doctoring its internal sales records.  HeadSpin and its CEO then used these inflated valuation and financial numbers to deceive investors into pouring approximately $80 million into the company between 2018 and 2020.  The Commission has filed a separate action against

HeadSpin CEO Lachwani that is pending before this Court. <u>Securities and Exchange Commission v. Manish Lachwani</u>, No. 3:21 Civ. 6554 (N.D. Cal.) (CRB).

2. HeadSpin made virtually all of its revenue by charging customers fees to use its hardware and software products. To create the illusion of strong and consistent growth, HeadSpin's CEO, who controlled all important aspects of HeadSpin's financials and sales operations, falsely inflated the values of numerous customer deals that, in reality, were much smaller. HeadSpin's CEO also fraudulently treated uncommitted deal amounts that he had discussed with customers as if they were guaranteed future payments. He concealed this inflation by creating fake invoices and altering real invoices to make it appear as though customers had been billed higher amounts.

3. HeadSpin's CEO's fraudulent actions increased the company's revenue-related financial measures, which, in turn, fueled the company's valuation upward. In fall of 2018, ahead of its Series B fundraising round, HeadSpin was valued at approximately half a billion dollars. Around a year later, in fall of 2019, HeadSpin's valuation for its Series C fund raise had jumped to approximately $1.1 billion and entered so-called "unicorn" status.

4. HeadSpin's CEO knowingly or recklessly provided these lies about the company's valuation and its seeming financial success to prospective investors. HeadSpin, through its CEO, made numerous false statements that were designed to convince investors that HeadSpin had hundreds of customers, including many of Silicon Valley's biggest and most high-profile companies, signed up to long-term contracts totaling tens of millions of dollars per year. Investors invested millions of dollars in HeadSpin based on these misrepresentations.

5. HeadSpin and its CEO's fraud unraveled in spring of 2020, following an internal investigation. HeadSpin's CEO was forced to resign, and HeadSpin revised its valuation dramatically downward from the $1.1 billion claimed during the Series C round to approximately $300 million.

6. HeadSpin has violated the antifraud provisions of the federal securities laws. Specifically, HeadSpin has violated 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

7. The SEC requests that the Court permanently enjoin HeadSpin from further violating the federal securities laws as alleged in this complaint.

## JURISDICTION AND VENUE

8. The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10. HeadSpin and its CEO, directly or indirectly, made use of the means and instruments of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

11. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District. HeadSpin's CEO met with and solicited prospective investors in this District, and offers and sales of securities took place in this District.

12. Under Civil Local Rule 3-2(e), this civil action should be assigned to the San Jose Division because a substantial part of the events or omissions that give rise to the claims alleged herein occurred in Santa Clara County, where HeadSpin's principal place of business is located.

## DEFENDANT

13. **HeadSpin, Inc.** is a Delaware corporation with its principal place of business in Palo Alto, California. HeadSpin provides customers with hardware and software tools to test their mobile software applications across the world. In 2020, after its fraud was uncovered, HeadSpin reduced its valuation by more than $800 million and returned approximately 70% of principal to investors in the Series B and C funding rounds. However, some investors retained their shares in HeadSpin, and the company remains operational.

**OTHER RELEVANT PERSON**

14. **Manish Lachwani** (referred to herein as "HeadSpin's CEO"), age 46, resides in Los Altos, California. He served as HeadSpin's Chief Executive Officer until he stepped down in around May 2020. Lachwani controlled HeadSpin's business functions and operations from its formation in about 2015 through his tenure as CEO. At all times relevant to the Complaint, Lachwani was acting in his official capacity or acting in furtherance of the business. Accordingly, the actions, omissions, and state of mind of Lachwani are imputed to HeadSpin. On August 25, 2021, the Commission filed a separate action against Lachwani in SEC v. Manish Lachwani, No. 3:21 Civ. 6554 (N.D. Cal.) (CRB).

**FACTUAL ALLEGATIONS**

I.   **HeadSpin Sells Customers Tools for Testing Mobile Apps.**

15. HeadSpin was founded in 2015 and its business provided hardware and software tools that allow customers to test their mobile software applications, or "apps," and ensure that their apps work on different operating systems as well as various internet and cellular data networks.

16. HeadSpin provided its customers access to mobile devices located all over the world. Customers were then able to use HeadSpin's proprietary software to test their apps on these devices across different networks. Typically, HeadSpin charged a one-time set-up fee as well as recurring fees for use of the devices and software.

17. HeadSpin sold its products and services in two ways. First, HeadSpin entered into direct agreements with corporate customers. Second, HeadSpin worked with third-party resellers, who acted as middlemen to market and sell HeadSpin's products and services to corporate customers.

18. In some cases, customers, such as the third-party resellers, signed non-binding agreements with HeadSpin that set forth the products and services they planned to purchase and sometimes listed the maximum amount they would spend on those items. However, the customer did not incur a commitment to pay HeadSpin until it submitted an order and HeadSpin, in response, charged the customer by sending an invoice.

**II.     HeadSpin, Through Its CEO, Engaged in a Fraudulent Scheme to Inflate Its Financials in Order to Drive Up Its Valuation.**

19.     Beginning at least in about 2018, HeadSpin, through its CEO, engaged in a fraudulent scheme to inflate its financial records in order to achieve high valuations of the company that would attract investors.

20.     HeadSpin's CEO understood that the amount of the valuation depended, in large part, on a key financial metric called "annual recurring revenue," or "ARR," as well as ARR growth over time. ARR is a measure of the total revenue expected per year from committed customers with signed contracts. The metric is commonly used by software companies like HeadSpin that charge customers recurring fees to use their products. A growing ARR shows that a company is successfully signing up new customers and/or expanding the deals it already has with existing customers.

21.     HeadSpin's CEO inflated the company's ARR by falsely increasing the values of several existing customer deals of all sizes, ranging from big deals with Silicon Valley heavyweights to low dollar-value deals with smaller companies, and relying on uncommitted amounts from non-binding agreements with other customers. HeadSpin's CEO entered the fabricated amounts into the company's detailed ARR-tracking Spreadsheet that he alone controlled. For example, in about 2018, HeadSpin's CEO sent an investor a version of the ARR Spreadsheet that claimed a reseller ("Customer 1") was contributing approximately $1 million in ARR. In reality, Customer 1 and HeadSpin had signed a non-binding agreement that, among other things, set a maximum cap of $1.215 million on its purchases over two years from HeadSpin. Importantly, Customer 1 was not obligated to pay anything until HeadSpin sent invoices at a later date. In the end, Customer 1 only paid HeadSpin approximately $500,000 over two years—far less than the maximum cap.

22.     In other instances, HeadSpin's CEO fabricated or altered invoices to provide post-hoc justifications to other HeadSpin employees for the inflated ARR amounts. For example, from 2018 through 2020, HeadSpin's CEO falsely claimed that a major San Francisco-based ride share company ("Customer 2") had agreed to pay HeadSpin about $1.44 million per year. In truth, Customer 2 made a single purchase worth $720,000 in 2018, and did not make a long-term commitment. To bridge the gap between reality and his false claims, HeadSpin's CEO concocted a fake invoice covering the

remaining amount (*i.e.*, $720,000) in 2018, and in 2019 he created two more fake invoices to represent a supposed renewal of the full $1.44 million.

23. In addition, HeadSpin's CEO falsely inflated the company's actual revenue numbers, which were also shared with investors, using the same methods that he used to fabricate ARR. HeadSpin's CEO dictated the inflated revenue numbers each quarter to HeadSpin's bookkeeper, who recorded those numbers in the company's financial statements. He frequently sent the numbers without supporting documentation (like contracts and invoices) notwithstanding the bookkeeper's regular requests for such backup, and he sometimes sent her fake or altered invoices that he had created, including the three fictional invoices related to Customer 2 and a doctored invoice related to Customer 1.

24. On the strength of its fraudulently inflated ARR and other financial numbers, HeadSpin achieved impressive valuations leading into its two fundraising rounds. In advance of the Series B round in fall of 2018, HeadSpin was valued at approximately $500 million. Around a year later, at the start of its Series C round, HeadSpin had surged in valuation to approximately $1.1 billion. HeadSpin's CEO falsely inflated the metrics, including ARR, in order to lure HeadSpin investors into paying increasingly higher prices for HeadSpin's shares.

25. HeadSpin's CEO was able to carry out his fraudulent scheme for years because he controlled and managed all the key aspects of HeadSpin's financials and sales operations, and he kept HeadSpin employees in those different departments isolated from each other. For instance, virtually all the information provided to HeadSpin's bookkeeper, including the supporting documentation for claimed revenue amounts, flowed through HeadSpin's CEO.

26. By virtue of his control over the company, HeadSpin's CEO knew, or was reckless in not knowing, that HeadSpin's ARR and other financial numbers were false and inflated. HeadSpin's CEO had sole ownership of the ARR Spreadsheet and used it to personally calculate the company's quarterly and yearly ARR. As HeadSpin's CEO admitted in a December 2017 email, he intended to "super micro manage[]" the company's financials and finance function, and he rebuffed repeated requests from late 2017 into 2020 from HeadSpin's board to hire a CFO to manage HeadSpin's day-to-day finances. At the same time, HeadSpin's CEO knew, or was reckless in not knowing, about the

company's relationships with customers because he personally interacted and negotiated with many of them, and he directly supervised the small staff of sales people who managed customer deals.

### III. HeadSpin, Through Its CEO, Lied to Series B Investors About Its Financials and Customers.

27. From August 2018 through October 2018, HeadSpin's CEO made numerous false and misleading representations about HeadSpin's ARR, financials, and customer growth in connection with the offer and sale of HeadSpin's preferred stock in the Series B round. In promoting the Series B offering, HeadSpin's CEO knowingly or recklessly provided investors with the false impression that HeadSpin was experiencing substantial growth in both its expected revenues and its number of customers. HeadSpin's CEO personally met and communicated those misrepresentations to prospective investors through emails, telephone calls, and in-person due diligence meetings. He also directed his employees to include false information in written investor materials provided to investors, including pitch decks, financial spreadsheets, and other promotional materials. The Series B offering succeeded in raising approximately $20 million from about 26 investors.

28. HeadSpin's CEO repeatedly knowingly or recklessly misrepresented HeadSpin's ARR and ARR growth to Series B investors by sending them ARR numbers that he had falsely inflated. He sent emails to investors in which he touted the inflated overall ARR for the company as well as the grossly overstated ARRs for certain high-profile customers. HeadSpin's CEO also provided a 2018 Pitch Deck to Series B investors that, among other things, listed falsely inflated "revenue commitment" amounts and growth percentages for specific big-name customers, including Customer 1 and Customer 2. In addition, HeadSpin's CEO provided certain large investors with versions of the detailed ARR Spreadsheet, which also contained inflated ARR numbers for Customer 1, Customer 2, and others.

29. HeadSpin's CEO sent those false ARR numbers even though he knew, or was reckless in not knowing, that HeadSpin's ARR would be a focus of prospective investors, who would use it to evaluate the extent to which the company's products were gaining traction with customers. HeadSpin's CEO also knew, or was reckless in not knowing, that ARR, which is a widely used metric in the software-subscription industry, was supposed to be calculated based on signed contracts

with committed customers. In fact, he told investors that HeadSpin's ARR reflected signed customer agreements with customers who had already been sent HeadSpin's products and were able to use them. Those representations were false and misleading.

30. HeadSpin's CEO made additional misrepresentations to Series B investors beyond the ARR numbers. HeadSpin's CEO knowingly or recklessly sent financial statements to investors that contained false and inflated revenues. He also promoted the inflated valuation. For instance, in an August 2018 email to an investor, HeadSpin's CEO touted that the company was "raising $10m @ $500m valuation."

31. Relatedly, HeadSpin's CEO also knew, or was reckless in not knowing, that Series B investors would be impressed by HeadSpin's purported roster of customers, which included some of the largest and most recognizable technology companies in the world. But HeadSpin's CEO knowingly or recklessly included numerous companies on the list even though those companies had terminated their relationships with HeadSpin or had declined to make a purchase after trying HeadSpin's products. For example, the 2018 Pitch Deck that HeadSpin's CEO shared with Series B investors falsely asserted that HeadSpin had experienced "No Customer Loss and Triple Digit Growth." In reality, HeadSpin had lost customers that decided to stop using HeadSpin's services. The 2018 Pitch Deck also included logos for at least 50 major companies, a number of which were not active HeadSpin customers. For instance, the deck included the logo of a highly successful Silicon Valley-based computer and cellphone manufacturer ("Customer 3") even though Customer 3's sole purchase expired more than a year earlier and was not renewed.

**IV.   Misrepresentations Made by HeadSpin, Through Its CEO, Catapulted Its Valuation to $1.1 Billion During the Series C Funding Round.**

32. Less than a year after its successful Series B fund raise, HeadSpin conducted a Series C fundraising round between August 2019 and February 2020 to offer and sell an additional $60 million of its preferred stock. HeadSpin's CEO's scheme to fraudulently inflate the company's ARR and other financials had continued throughout 2019, and by the start of the Series C round, HeadSpin's CEO knowingly or recklessly told investors that HeadSpin would reach approximately $80 million of ARR by year end. The company's impressive (but false) financials fueled a valuation

of approximately $1.1 billion, a milestone that earned the startup "unicorn" status – a status touted by HeadSpin's CEO and noticed by investors. Ultimately, 29 investors purchased HeadSpin stock at prices based on that inflated valuation.

33. As with the Series B round, HeadSpin's CEO knowingly or recklessly made numerous misrepresentations to Series C investors about ARR, revenue, and customer growth. HeadSpin's CEO continued to knowingly or recklessly claim falsely inflated ARRs for many customers, including Customer 1 and Customer 2, in an updated version of the ARR Spreadsheet that he sent to Series C investors. In fact, he increased the claimed ARRs for certain existing customers. For example, according to the 2019 ARR Spreadsheet, a reseller ("Customer 4"), had ARR of over $10 million. However, HeadSpin only received approximately $1.4 million total in payments from Customer 4 between 2018 and 2019. He also added inflated ARRs for new customers, including, for instance, a major credit card company that signed a non-binding agreement with HeadSpin in 2019. Separately, the financial statements that HeadSpin's CEO provided to Series C investors contained similarly inflated revenue numbers.

34. HeadSpin's CEO also continued to knowingly or recklessly make misrepresentations about HeadSpin's retention of customers. In around September 2019, HeadSpin's CEO sent a prospective investor a version of the 2019 ARR Spreadsheet and knowingly or recklessly misrepresented that HeadSpin had only lost two customers and that "[e]very other deal has expanded or stayed the same." He made those claims even though he knew, or was reckless in not knowing, that many listed customers – including Customer 1, Customer 2, and Customer 4 – had paid HeadSpin far less than the amounts claimed in the ARR Spreadsheet. As another example, HeadSpin's CEO reviewed a draft investment memorandum put together by one of the company's existing investors in anticipation of the Series C round. He knowingly or recklessly confirmed the accuracy of the memorandum even though it incorrectly identified Customer 3, which had ended its relationship with HeadSpin in 2017, as part of the company's "impressive customer base."

35. The grossly overstated ARR, revenues, and customer lists were important to investors who participated in HeadSpin's two offerings between 2018 and 2020 because those metrics were

directly related to the future growth and success of HeadSpin's business and, thus, the likelihood that investors would obtain a return on their investments in the company.

### V. HeadSpin and Its CEO's Fraud Unraveled When Its ARR Inflation Came to Light.

36. In March 2020, the company's Board of Directors was alerted to concerns about the accuracy of the financial and customer information provided to investors and discovered, through an investigation, significant issues with HeadSpin's reporting of customer deals.  HeadSpin then determined, based on a subsequent review of its financial information, that HeadSpin's ARR at the end of 2019 was closer to $10 million, as opposed to the $80 million represented to investors.

37. In May 2020, HeadSpin forced its CEO to resign.

38. HeadSpin revised its valuation from approximately $1.1 billion down to approximately $300 million.  The company also returned approximately 70% of principal to investors in the Series B and C funding rounds through a recapitalization process.  The company further offered to return the remaining funds in the form of promissory notes with one percent interest.  Approximately 31 investors chose to retain their HeadSpin stock instead of exchanging for promissory notes.

39. In addition, HeadSpin's remedial efforts included hiring new senior management, including a new CEO, COO, GC, and Controller; expanding its board; and adopting new processes and procedures designed to ensure transparency and accuracy of deal reporting and associated revenues.

### FIRST CLAIM FOR RELIEF

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5)**

40. The Commission realleges and incorporates by reference paragraphs 1 through 39.

41. Defendant, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

    a. Employed devices, schemes, or artifices to defraud;

    b.   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

    c.   Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

42.   By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**(Violations of Section 17(a) of the Securities Act)**

43.   The Commission realleges and incorporates by reference paragraphs 1 through 39.

44.   Defendant, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails,

    a.   with scienter, employed devices, schemes, or artifices to defraud;

    b.   obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.   engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

45.   By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

I.

Enter an order permanently enjoining Defendant from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

II.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

III.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: January 28, 2022             Respectfully submitted,

*/s/ David Zhou*
David Zhou
Marc D. Katz
Erin E. Wilk
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION